FILED
United States Court of Appeals
Tenth Circuit

December 29, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

RAYTHEON AIRCRAFT COMPANY,

　　　　Plaintiff - Counter-Defendant -
　　　　Appellant,

　　v.

UNITED STATES OF AMERICA,

　　　　Defendant - Counter-Claimant -
　　　　Appellee.

No. 08-3237

_____

LOCKHEED MARTIN CORPORATION,

　　　　Amicus Curiae.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:05-CV-02328-JWL)

_____

Robert M. Jackson, Honigman Miller Schwartz and Cohn LLP, Detroit, MI (Brian
D. Wassom of Honigman Miller Schwartz and Cohn LLP, Detroit, MI; Stephen J.
Torline and Derek T. Teeter of Husch Blackwell Sanders LLP, Kansas City, MO,
with him on the briefs), for Appellant.

Brian C. Toth, Attorney, Environment & Natural Resources Division, United
States Department of Justice (Scott Pemberton, Of Counsel, Regional Counsel for
Region 7, United States Environmental Protection Agency; Catherine R. Sanders,
Of Counsel, Office of Chief Counsel, United States Army Corps of Engineers;
John C. Cruden, Acting Assistant Attorney General, Environment & Natural
Resources Division; Sean Carman, Attorney, Environment & Natural Resources
Division, United States Department of Justice; and Mary Whittle, Attorney,

Environment & Natural Resources Division, United States Department of Justice, with him on the brief), Washington, D.C., for Appellee.

Raymond B. Ludwiszewski, Peter E. Seley, and Michael K. Murphy, Gibson, Dunn & Crutcher LLP, Washington, DC, on the brief for Amicus Curiae in support of Appellant.

Before **MURPHY**, **EBEL**, and **HARTZ**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I.  Introduction

This is an appeal from a judgment in favor of the United States in a cost recovery action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675.  At trial, the parties disputed the degree to which each is liable for trichloroethylene ("TCE") contamination near Hangar 1 and Hangar 4 at Tri-County Public Airport[1] in Herington, Kansas.  The United States Army used the airfield from 1942 to 1945.  Raytheon Aircraft Company is a successor to Beech Aircraft Corporation, which operated the airfield during the 1950s.  The United States and Raytheon agree they are the only two potentially liable parties.

---

[1]During the Army's use of the site, it was known as Herington Army Air Field.  For ease of reference, the court refers to the air field as "Herington Field" for all relevant periods.

Raytheon appeals the district court's finding that it is solely liable for contamination at Hangar 1, as well as the court's decision to award the United States costs associated with its attempts to list the site on the National Priorities List ("NPL"). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **AFFIRMS** the district court's decision.

## II. Background

The Army operated Herington Field from 1942 to 1945 for processing military aircraft during World War II. Raytheon's predecessor, Beech, operated the airfield during the 1950s. The airfield's four hangars were located adjacent to the tarmac and ran north to south with Hangar 1 at the northernmost position.

In the mid-1990s, TCE contamination was discovered immediately to the north of Hangar 1 and surrounding Hangar 4. The Kansas Department of Health and the Environment ("KDHE") confirmed the groundwater beneath the site was contaminated with TCE and its degradation compounds. The KDHE prepared a report of its findings, which it forwarded to the Environmental Protection Agency ("EPA"). The EPA then sought information from the Army Corps of Engineers and Raytheon regarding the use of TCE at the site. Raytheon admitted it utilized TCE in two vapor degreasers, one in Hangar 1 and another in Hangar 4, and stored TCE in drums in a building to the northwest of Hangar 1. The Army Corps of Engineers denied the Army ever used TCE at the site.

The EPA conducted an expanded site inspection ("ESI") and remedial investigation at Herington Field to determine the nature and extent of the contamination. The investigation culminated in a final report concluding the TCE contamination stemmed from Beech's use of vapor degreasers at various locations identified as the primary sources of contamination. The EPA also used the ESI in support of its proposal to list the site on the NPL, "the list, compiled by EPA pursuant to CERCLA section 105, of uncontrolled hazardous substance releases in the United States that are priorities for long-term remedial evaluation and response." 40 C.F.R. § 300.5. The site was never listed on the NPL, however, because the State of Kansas withheld its consent.

At the direction of the EPA and KDHE, Raytheon undertook various cleanup efforts at the site, including the excavation of a large area north of Hangar 1. Raytheon contended, however, that the Army did use TCE at the site during its World War II operations and was responsible for the costs incurred in cleaning up the site. Ultimately, Raytheon brought an action against the United States for cost recovery under § 107(a) of CERCLA and for contribution under §§ 107(a) and 113(f). The United States counterclaimed for cost recovery under §§ 107(a)(2) and 107(a)(4)(A) and for contribution under § 113(f).

The district court conducted a ten-day bench trial. The evidence at trial is summarized as follows. Herington Field was constructed in 1942 and was activated in early 1943 as the military expanded to meet wartime needs.

Beginning in May 1944, B-29 bombers began to arrive at Herington Field. The B-29 program was a high priority because the B-29 bomber was capable of reaching the Japanese mainland without needing to refuel.

TCE is a colorless solvent used to remove oil and grease from metal parts. TCE was the Army's preferred degreasing agent during WWII. One method of degreasing aircraft parts was to use a "vapor degreaser" in which the metal part is suspended above a boiling vat of TCE. The TCE vapors rise and cool, condensing on the metal part. As the TCE drips back into the vat, it removes the oil and grease. The district court determined if a vapor degreaser had been used at Herington Field, it would have employed TCE.

Expert testimony indicated the Army "received the TCE it needed" during World War II, though the parties' experts disagreed as to how much TCE was actually needed. Raytheon's expert, Mr. Doherty, is an environmental engineer who has studied the use of TCE in the United States. He testified the Army enjoyed adequate supplies, and at times a surplus, of TCE during the war. On the other hand, Dr. Brigham, a historical expert for the United States whom the court deemed highly credible, testified the government regulated the distribution of many chemicals, including TCE, so manufacturing products could be properly apportioned for the war effort. According to Dr. Brigham, the vast majority of TCE was allocated to defense contractors for the production of airplanes, tanks, and guns. For instance, in 1944, the War Production Board anticipated that over

90% of TCE would be allocated for this use, while the Army itself would only receive a small amount. Apportionment of TCE continued throughout the war.

Due to this apportionment of TCE, the Army itself had to internally regulate how its share of TCE would be used. Thus, a November 1942 Army technical order limited the use of TCE vapor degreasing to "depots and such stations as are specifically authorized . . . to employ this method of cleaning." Depots performed four-level-echelon maintenance, which is the highest and most sophisticated level, including complete engine overhauls and restoration of damaged aircraft. Herington Field was classified as a subdepot, and a number of war veterans, who worked at Herington Field and were deemed highly credible, testified Herington Field performed only third-echelon maintenance; fourth-echelon maintenance occurred at Tinker Field in Oklahoma City, Oklahoma.

Consequently, Herington Field was not permitted to use the vapor degreasing method without special authorization, and no direct evidence of any such authorization was produced. Raytheon pointed out an additional, but unavailable, technical order was issued in April 1944, and Raytheon suggested it may have lifted constraints on TCE's use. The nature of the order, however, was never confirmed.

The parties also presented testimony from war veterans who worked at Herington Field. Some of these witnesses stated the B-29s at Herington Field were typically new and needed little maintenance. There was also testimony the

-6-

B-29s could be cleaned with soap and water or else simply wiped with a rag. This description of the cleaning process was consistent with the November 1942 technical order which advocated the use of soft soap when practical, and other cleaners, such as kerosene, when soap was not effective.

Raytheon presented evidence that even new B-29s needed thorough cleaning due to their tendency to leak oil and argued TCE was likely used because of the high priority given to the B-29 program. Raytheon also presented evidence that aircraft were cleaned in the area north of Hangar 1 where heavy TCE contamination was found. Likewise, spark plugs were cleaned in a building near the same location. According to Raytheon, the focus of the Army's degreasing operations in the exact area where the contamination occurred establishes the Army's use of TCE.

Raytheon sought to bolster its claim the Army used TCE by presenting evidence that TCE was often used as a winterizer in fire extinguishers. Raytheon, however, could not provide evidence the fire extinguishers at Herington Field ever required winterization or were actually winterized.

Raytheon also presented testimony from veterans as direct evidence of TCE use. Colonel Bickerstaff, who worked at Herington Field during World War II, remembered a vapor degreaser being used to clean spark plugs. The district court, however, ultimately found that Colonel Bickerstaff lacked credibility on this issue because he candidly noted he worked at many bases during his 21 years

of service "and did a lot of things and . . . kind of lost track of what [he] did do."

Additionally, Colonel Bickerstaff's description of the degreaser included the presence of an agitator, a glass enclosure, and a glass top. The expert testimony established an agitator mechanism would not have been used on a vapor degreaser, and no expert knew of a vapor degreaser with a glass top or enclosure. Further doubt was cast on Colonel Bickerstaff's account because the spark plug building was equipped with non-sparking fans and a blower system, which suggests the Army used a flammable solvent to clean spark plugs rather than TCE, a non-flammable solvent.

Raytheon also offered the deposition testimony of another veteran, Mr. Rosendale, who initially stated TCE was used at Herington Field. The court ultimately disregarded his testimony as lacking credibility because Rosendale appeared to be a highly suggestible witness. Further undermining his testimony on this point was Rosendale's later clarification on cross-examination, "I don't know if it was TCE, but it was a cleaning solvent. . . . But TCE, I don't remember it actually being used as, you know, the solvent. That's too many years ago."

Aside from Colonel Bickerstaff's and Rosendale's testimony, no other veteran directly remembered the use of TCE at Herington Field. They instead described a solvent "like kerosene," which the United States's experts testified was probably Stoddard solvent rather than TCE.

Beech, on the other hand, undisputably used TCE in two large vapor degreasers while operating the airfield. Though it admitted this fact, Raytheon argued the nature of Beech's use of TCE made it unlikely Beech was the party responsible for the contamination immediately to the north of Hangar 1. For instance, one of Beech's vapor degreasers was located in the southwest corner of Hangar 1 and any spills would have drained to the south where no TCE was located. Beech's other vapor degreaser was located in Hangar 4. Raytheon also presented evidence that from 1950 to 1955, it used only phenols at the north end of Hangar 1. Those phenols did not contain TCE and, in any case, initially drained to a collecting pond north of Hangar 1 in an area where no TCE was found. The drain was later re-routed to three Imhoff tanks, again where no TCE contamination was present. Moreover, while phenols did travel the entire length of the drain, no TCE was detected there, which Raytheon claims indicates TCE was never disposed of through the drain at all.

Additionally, no TCE contamination was located in the storage area to the northwest of Hangar 1 where Beech stored its TCE. Because TCE contamination north of Hangar 1 was concentrated near Army degreasing operations rather than Beech's TCE operations, Raytheon argued the contamination must have been caused by the Army.

Raytheon next offered testimony from its expert, Mr. Mesard, regarding the contaminant plume in an attempt to show the TCE must have been in the soil long

-9-

before Beech used the airfield. Specifically, the leading edge of the plume contains only TCE. The rest of the plume contains a mixture of TCE and its degradation products cis-1, 2-dichlorethylene ("DCE"), and vinyl chloride ("VC"). As Mr. Mesard explained, this is significant because TCE degrades into DCE and VC when a significant carbon source, such as the phenols Beech used from 1950 to 1955, is present in an environment without oxygen. TCE, DCE, and VC all adhere to organic carbon sources and tend to move at a slower rate than the flow of groundwater. TCE is undeniably the slowest moving of the three, such that if all were introduced into the soil at the same time, VC would lead the plume, followed by DCE, then TCE. But because TCE leads the plume at Herington Field, Mr. Mesard opined TCE must have been introduced prior to phenol, meaning the Army introduced at least some, if not all, of the TCE.

The United States's expert, Mr. Robertson, offered a different explanation as to why TCE led the plume. Mr. Robertson noted the area north of Hangar 1 sits on a thick layer of overburden, which contains clay. The overburden also sits on bedrock. The area around Hangar 4, on the other hand, has a thin layer of overburden, which is nonexistent in some of the contamination "hot spots." Thus, the layer of bedrock at Hangar 4 is more permeable. Consequently, he opined contaminants released at Hangar 4 likely migrated to the aquifers below the bedrock much more quickly than the contaminants at Hangar 1. Once the TCE reached the aquifers under Hangar 4, it traveled north and contaminated the area

below Hangar 1 before the TCE released at Hangar 1 reached the area. As a result, Mr. Robertson concluded the TCE leading the contaminant plume originated at Hangar 4 and was able to bypass the contaminants released at Hangar 1. Because this TCE never interacted with the phenol, he claimed it did not degrade in the same manner as the TCE released at Hangar 1.

In another attempt to persuade the court Beech did not release the TCE contaminants, Raytheon presented testimony that Beech recycled its TCE waste and therefore would not have released it into the ground. This testimony came from a former Beech chemist, Xury Hole, who worked at Herington Field. However, Mr. Hole admitted the degreasers were cleaned during the evenings or on weekends when he was not working. Though he believed the waste was removed and placed into drums for recycling, he never actually witnessed this process. He also admitted he would have no way of knowing whether the TCE waste was ever dumped or otherwise disposed of onsite.

In considering all of this evidence, the court found the United States's experts credible and found Raytheon had not met its burden of establishing the Army ever used TCE at all. Because it was undisputed Beech did use TCE, the court found any contamination must have come from Beech's operations. As a result, the district court held Raytheon wholly liable for the contamination. Accordingly, Raytheon was ordered to pay a total of $3,195,632.98 for the EPA's response costs.

-11-

## III. Discussion

### A. *The District Court's Findings*

Raytheon argues the district court erred in finding Raytheon solely liable for the TCE contamination to the north of Hangar 1.[2] This court reviews the district court's factual findings for clear error, giving the district court's credibility determinations great deference. *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1078 (10th Cir. 2009). "'If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).

Raytheon claims the district court ignored much of the evidence presented and made inconsistent rulings to support its findings. Primarily, Raytheon argues it established the Army was at least partially liable for the contamination because the Army's operations were focused in the exact areas where TCE contamination was later located, while Beech's use of TCE in Hangar 1 was limited to the southwest corner. Raytheon claims this evidence, coupled with Herington Field's important task of maintaining the B-29s, the highest priority aircraft during the

---

[2]Raytheon does not contest its liability as to the contamination surrounding Hangar 4.

war, makes it clear the Army would have used TCE, its preferred solvent, to clean these aircraft before sending them into battle.

While this circumstantial evidence could certainly support an inference that the Army did use TCE at the site, it does not compel such a finding. The most important consideration before the district court was whether the Army actually used TCE at Herington Field, which Raytheon was unable to conclusively establish. The evidence presented from the government's historical expert established the Army placed restrictions on the availability of TCE and apportioned its use primarily to defense contractors for the manufacture of wartime goods. As part of this apportionment, the military itself limited the use of TCE in vapor degreasers to fourth-echelon depots, but Herington Field was only a third-echelon subdepot. While special authorization could have permitted Herington Field's use of TCE for vapor degreasing, Raytheon was unable to establish such authorization was ever given. The court also found credible the testimony of various war veterans who stated soap and water were in fact used to clean the new B-29s, which they testified did not need much cleaning.

Raytheon challenges the district court's reliance on military rationing in light of evidence the Army stockpiled TCE and had all it needed during the war. Raytheon contends it is more likely Herington Field did have special authorization to use TCE because other subdepots were undisputably using vapor degreasers even though those subdepots did not process the indispensable B-29s.

While this evidence certainly supports Raytheon's case, it merely establishes the Army could have used TCE at Herington Field had it obtained the proper authorization, a fact the district court recognized. Raytheon, however, was unable to produce any credible direct evidence of actual authorization. Raytheon's best evidence that such authorization was given to Herington Field came from Colonel Bickerstaff, who testified the Army used a vapor degreaser at Herington Field. However, the district court was entitled to, and did, find his testimony lacked credibility as to this issue because he inaccurately described the physical components of a vapor degreaser and admitted his work at a large number of Army bases may have clouded his memory of what occurred at Herington Field. Whereas Colonel Bickerstaff's testimony was credited as to other topics when corroborated by other veterans, it appears no other veteran remembered the use of a vapor degreaser at Herington Field. As a result, the district court did not clearly err in refusing to accept his testimony on this subject.

Neither was it clear error for the court to determine Raytheon failed to present sufficient evidence the fire extinguishers at Herington Field were actually winterized with TCE. Indeed, no such evidence was offered. Raytheon merely established TCE can be used to winterize fire extinguishers without ever tying that use to Herington Field during the Army's tenure there.

Raytheon next points to physical evidence indicating TCE was present in the soil long before the release of phenols. Raytheon offered evidence at trial that

Beech released approximately 4,000 gallons of phenol per day at the site in the 1950s. According to Raytheon, if Beech was releasing TCE and phenols simultaneously, the degradation process would have occurred immediately and VC and DCE would lead the contamination plume instead of TCE. But because TCE leads the plume, Raytheon argues, the TCE must have been released long before the phenols. The government, however, offered evidence from its expert that provided the court with an alternate explanation. Mr. Robertson's theory that the TCE at the front of the plume originated at Hangar 4 provided a plausible explanation for why TCE led the plume, rather than its degradation products. Specifically, Mr. Robertson opined TCE originating at Hangar 4 invaded aquifers more quickly and therefore was able to travel out in front of TCE originating in Hangar 1, which had to seep through a much thicker layer of overburden. This theory provides an explanation as to how Beech could have been the sole contaminator, and the district court's acceptance of Mr. Robertson's testimony rather than Raytheon's expert is not clearly erroneous.

Raytheon also contends the district court's suggestion that "sloppy disposal" into the drain could have caused the contamination at Hangar 1 is implausible in light of the sheer volume of TCE in the soil. Raytheon argues the level of contamination, which covered a 1.4 acre zone containing 2,600 pounds of TCE, required more than sloppy practices. Moreover, Raytheon stresses that no TCE was located at the end of the drain, which indicates none was poured into the

drain at all. Rather, Raytheon argues the TCE contamination was so massive it must have resulted from regular activity at that location. Because there is no indication Beech conducted its TCE operations directly over the contaminated area north of Hangar 1, Raytheon claims it is far more likely that the Army's cleaning and maintenance on the B-29s was the cause of the contamination. Consequently, Raytheon argues the district court clearly erred in finding Raytheon liable.

Raytheon's arguments notwithstanding, the district court did not commit clear error. First, the lack of TCE at the end of the drain is not contradicted by the court's findings of fact, because the court referred to "sloppy disposal practices in connection with use of the drain . . . that might have caused TCE to release to the environment *near the drain rather than flow into the drain and trough*." *Raytheon Aircraft Co. v. United States*, 556 F. Supp. 2d 1265, 1292 (D. Kan. 2008) (emphasis added). Furthermore, a fair reading of the district court's decision makes clear the court did not find "sloppy disposal practices" were in fact the sole method by which Beech released TCE into the soil. Rather, the district court indicated such practices "might have caused" the contamination. While the court never pinpointed the exact source of Beech's release of contamination, it did not need to do so. Its decision was obviously based on Raytheon's failure to meet its burden of showing the Army actually used TCE at Herington Field.

The court reasonably chose not to credit the testimony of veterans who claimed TCE was used by the Army. Consequently, there was no credible direct evidence supporting Raytheon's claims, and the Army's limitations on the use of TCE make it clear Herington Field was not permitted to use TCE without special authorization. Raytheon presented no evidence that any such authorization was given. While the proximity of the Army's operations to the contamination, coupled with the importance of the B-29 program, may have given the district court a sufficient basis to find in Raytheon's favor, that evidence was not so strong as to compel such a verdict, especially in light of the uncertainty as to whether the Army ever used TCE at Herington Field.

Because it was undisputed that Beech did use TCE and the parties agree no third party could have caused the contamination, the district court's finding that Raytheon was solely liable for the contamination was not clearly erroneous.

*B. Costs Associated with the NPL*

Next, Raytheon argues even if it is solely responsible for the contamination, the district court erred in requiring it to pay $1,454,827.13 in costs associated with the EPA's attempt to list Herington Field on the NPL. These costs stem primarily from the decision to conduct an ESI. According to Raytheon, these costs are not recoverable because the government abandoned its

efforts to list the site on the NPL.[3]  The district court's conclusions of law are

reviewed de novo, and its findings of fact are reviewed for clear error.  *Tosco*

*Corp. v. Koch Indus.*, 216 F.3d 886, 892 (10th Cir. 2000).

CERCLA § 107(a)'s subparagraph (A) makes a responsible party liable for

"all costs of removal or remedial action incurred by the United States Government

. . . not inconsistent with the national contingency plan."[4]  42 U.S.C. § 9607(a).

"Removal" includes "such actions as may be necessary to monitor, assess, and

evaluate the release . . . of hazardous substances" as well as "action taken under

section 9604(b)."  42 U.S.C. § 9601(23).  Permissible response actions under §

9604(b)(1) include

> such investigations, monitoring, surveys, testing, and other
> information gathering as [the President] may deem necessary or
> appropriate to identify the existence and extent of the release or
> threat thereof, the source and nature of the hazardous substances,
> pollutants or contaminants involved, and the extent of danger to the
> public health or welfare or to the environment.  In addition, the
> President may undertake such planning, legal, fiscal, economic,

---

[3]The record is not entirely clear that the EPA's effort to list the site on the NPL has been "abandoned," as Raytheon argues.  The parties agree the State of Kansas did not consent to the listing, which makes the site ineligible for placement on the NPL.  At oral argument, however, the government stated the effort has not been abandoned.  Rather, the State's continued opposition makes the listing impossible.  According to the government, the site remains proposed for the NPL and could still be listed if the State of Kansas ever consents.  Despite this discrepancy, this court need not decide whether the effort to list the site on the NPL has actually been abandoned because the resolution of that factual issue does not alter the outcome of this appeal.

[4]The national contingency plan is described at 42 U.S.C. § 9605 and 40 C.F.R. part 300.

engineering, architectural, and other studies or investigations as he
may deem necessary or appropriate to plan and direct response
actions, to recover the costs thereof, and to enforce the provisions of
this chapter.

Raytheon does not object to the district court's conclusion that conducting
an ESI is a "removal or remedial action" under CERCLA. Rather, Raytheon
claims the ESI was inconsistent with the national contingency plan because the
EPA ultimately ceased its efforts to have Herington Field listed on the NPL. The
district court did not directly address this argument, determining only that the
costs of an ESI, "regardless of whether that investigation was conducted to
determine eligibility for listing on the NPL, are recoverable costs" under § 107's
subparagraph (A). The question remains, then, whether an ESI is necessarily
inconsistent with the national contingency plan if the government subsequently
abandons its attempt to list a site on the NPL.

When the government seeks recovery of its costs, the burden of proof on
the question of inconsistency lies with the defendant. *United States v. Hardage*,
982 F.2d 1436, 1442 (10th Cir. 1992). Furthermore, "[w]hen the government is
seeking response costs . . . consistency with the [national contingency plan] is
presumed unless the defendant can overcome this presumption by presenting
evidence of inconsistency." *Id.* To demonstrate inconsistency with the national
contingency plan, "a defendant must show that the government acted arbitrarily

-19-

and capriciously in failing to consider cost, or in selecting a remedial alternative that is not cost-effective." *Id.* at 1443.

Raytheon rests its argument on an unpublished district court decision from the Western District of Washington. *United States v. Rayonier, Inc.*, No. C01-5743-RBL (W.D. Wash. Feb. 25, 2004).[5] In *Rayonier*, the court determined "the EPA's decision to conduct the ESI in the manner, and for the purpose, it did [was] arbitrary and capricious." *Id.* at 11, ¶ 13. This conclusion was based on a number of factual findings, however, including that the decision to conduct the ESI was driven "almost totally" by a desire to list the site on the NPL, even though such an attempt was "a useless endeavor." *Id.* at 5, ¶ 24. Specifically, the success of an attempt to list the site was highly unlikely because the fund used by the government to clean up NPL sites was empty, the State of Washington had made clear that it opposed the listing, sufficient data already existed without the ESI to permit a high enough score for listing on the NPL, and Rayonier had already expressed a willingness to voluntarily clean up the site. *Id.* The district court also found the EPA had collected samples at locations with discharges

---

[5]The district court declined to consider *Rayonier* because it was unable to locate a copy of the decision. Raytheon's failure to attach a copy apparently resulted from confusion regarding District of Kansas Local Rule 7.6(b), which provides an unpublished decision cited by a party must be attached as an exhibit to the party's brief "only if it is unavailable via electronic means." Because the decision was available through PACER, counsel did not attach it. The district court stated the decision should have been provided under the Local Rules and thus declined to consider *Rayonier*.

unrelated to the site and used inappropriate sampling methods, such that many of the samples obtained in connection with the ESI were not useful. *Id.* at 4, ¶¶ 20-21. In light of these facts, the district court determined that conducting the ESI to obtain placement on the NPL "made no sense and was arbitrary and capricious." *Id.* at 5, ¶ 24.

Raytheon's reliance on *Rayonier* is curious because *Rayonier* says nothing about the effect of the government's abandonment of an attempt to list a contaminated site on the NPL. In fact, the mere abandonment says nothing about whether the government acted arbitrarily or capriciously in selecting the remedial action of conducting an ESI. Raytheon presents no case law to suggest otherwise. Rather, this court concludes that a party who simply points to the government's decision to discontinue its pursuit of a listing has failed to overcome the presumption of an ESI's consistency with the national contingency plan.

Were this court to adopt Raytheon's view that the decision to abandon a good faith attempt to list a site on the NPL makes that attempt arbitrary and capricious as a matter of law, the EPA would be forced to continue expending efforts and funds in support of a listing in order to recover its costs, even where the results of the ESI itself ultimately reveal the contamination is not serious enough to warrant the listing. Such a result is untenable.

Moreover, to whatever extent Raytheon attempts to compare *Rayonier*'s factual basis to this case, the court sees no similarity. The district court in

*Rayonier* was faced with numerous facts indicating the government's primary goal, placement of the site on the NPL, was unattainable from its inception. Here, Raytheon presents no evidence the ESI was initiated for the sole purpose of listing the site on the NPL. In fact, the district court indicated the ESI served other purposes, including establishing the nature and extent of contamination and determining potential source areas for the contamination to assist with clean-up. Likewise, there is no evidence the EPA should have known it could not obtain an NPL listing when it first initiated the ESI. Though it is not entirely clear from the record, it appears the EPA only ceased efforts to list the site, if at all, after it became clear those efforts would be fruitless in light of the State of Kansas's opposition.

Thus, this court concludes Raytheon has failed to rebut the presumption that the EPA's efforts to list the site on the NPL were consistent with the national contingency plan. Because Raytheon has presented no evidence to support a determination that the EPA's actions were arbitrary and capricious, the district court's judgment must be affirmed.

*C. Insurance Proceeds*

Because the district court's decision is affirmed, we need not address Raytheon's argument that the district court should not be permitted on remand to consider amounts recovered under its insurance policies as an equitable factor in allocating response costs.

## IV. Conclusion

The judgment of the district court is **AFFIRMED.**